The MUNTERS
CORPORATION, Plaintiff,

v.

MATSUI AMERICA,
INCORPORATED, Defendant.

No. 89 C 3782.

United States District Court,
N.D. Illinois, E.D.

Oct. 25, 1989.

MEMORANDUM OPINION
AND ORDER

ZAGEL, District Judge.

## I. INTRODUCTION

In this action the plaintiff, The Munters Corporation ("Munters") has brought suit charging the defendant, Matsui America, Inc. ("Matsui") with: 1) infringement of the plaintiff's registered trademark under sec. 32(1) of the Trademark Act of 1946 ("Lanham Act"), 15 U.S.C. sec. 1114(1); 2) use of a false designation of origin under sec. 43(a) of the Lanham Act, 15 U.S.C. sec. 1125(a); 3) common law trademark infringement; 4) violation of the Illinois Uniform Deceptive Trade Practice Act; 5) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act; 6) trademark dilution under the Illinois Anti–Dilution statute; 7) common law unfair competition; and 8) breach of contract. The defendant filed a counterclaim alleging that it had not violated any rights of plaintiff. The defendant also filed a motion to amend its counterclaim in order to seek cancellation of the plaintiff's trademark registration.

On June 29, 1989, we granted the plaintiff's motion for preliminary injunction. On August 31, 1989, this Court held a hearing to determine whether the plaintiff was entitled to a permanent injunction. For the following reasons, the plaintiff's motion is denied.

## II. FACTS

The plaintiff, Munters, is a Delaware corporation with its headquarters in Florida. Munters operates a division, Cargocaire Engineering Corporation ("Cargocaire"), located in Massachusetts. Cargocaire was originally a separate and independent company that Munters' parent company, Carl Munters AB of Sweden, acquired in 1978. In November 1987, Munters and Cargocaire merged. Munters, through Cargocaire, manufactures and sells industrial environmental control apparatus, such as heating, ventilation, and cooling equipment, including a dehumidifying apparatus. Munters' products are general purpose de-

Michael A. Forti, Bell, Boyd & Lloyd, Chicago, Ill., Pasquale A. Razzano and Marilyn Brogan, Curtis, Morris & Safford, New York City, for plaintiff.

Nancy E. Sasamoto and Edward J. Underhill, Masuda, Funai, Eifert & Mitchell, Ltd., Chicago, Ill., for defendant.

humidifiers, and no single model is designed specifically for the plastics industry. However, Munters' dryers have been used in the plastics industry, primarily in the drying of plastics molds and the drying of mold rooms. All Munters' dehumidifying apparatus contain a wheel rotor, which is a porous, extended-surface cylinder composed of desiccant material. The desiccant absorbs moisture in air passed through the channels formed in the rotor, as the wheel slowly rotates.

The defendant, Matsui, is a wholly-owned subsidiary of Matsui Manufacturing Company, Ltd. ("Matsui Mfg."), a Japanese corporation. Matsui is an Illinois corporation with its headquarters in Elk Grove Village, Illinois. Matsui manufactures and distributes equipment exclusively for the plastics industry in the United States, including pneumatic conveyors, hopper loaders, hot air hopper dryers and dehumidifiers, mold temperature controllers, mold chillers, and material mixers and blenders. Plastics manufacturers use Matsui's dehumidifying equipment prior to processing to dry hydroscopic resin material stored in a hopper. Before the manufacturer melts and injects the plastic resin material into the molding press, Matsui's dehumidifier dries the plastic granules. Matsui's equipment contains a desiccant wheel composed of ceramic paper whose purpose is similar to the rotor in Munters' space dehumidifier. Unlike Munters' equipment, Matsui does not design any of its equipment for space dehumidification. Rather, Matsui's dehumidifier has a specific application: drying plastic resin. On the other hand, Munters does not manufacture or distribute a dehumidifying dryer for drying plastic resin. We find that Munters' and Matsui's respective dehumidifiers are not interchangeable and are not competitive for the purpose of plastic resin drying.

A typical plastic injection molding facility consists of large storage silos at the plant that the manufacturer fills with the plastic resins prior to processing. A pneumatic conveying device transports the plastic resin from trucks and rail cars into the silos. From the silos, the resin proceeds to indoor storage tanks and then to mixers, where other materials may be added to the resin. If then required, a dryer removes any moisture from the resin. The resin is then conveyed to the injection molding machines, where the resin is readied for injection into the molds. Matsui distributes the storage silos, storage tanks, and the plastic resins conveying drying and mixing equipment. Munters does not manufacture or distribute any of the products distributed by Matsui.

Munters received trademark registration of "HoneyCombe" for a "dehumidifying apparatus" on October 10, 1961 and renewed its registration by October 10, 1981. Munters' position is that the trademark applies to both its dehumidifier ("HoneyCombe dehumidifier") and to its desiccant wheels ("HoneyCombe wheels or rotors"). Munters places "HoneyCombe" on all its products that contain, and all its advertising literature that promote, the desiccant wheel. Munters also displays the "Cargocaire" or "Munters" name and logo on all its advertising literature.

Prior to an agreement signed in May 1988 by Munters and Matsui, Matsui referred to its plastic resin dehumidifier as the "Honeycomb DMZ Dehume Jet Dryer." Pursuant to its understanding of the agreement, Matsui ceased referring to its plastic resin dehumidifier as "Honeycomb" in its promotional literature. However, Matsui continued to describe the desiccant wheel within its resin dehumidifier as honeycomb-shaped.

Munters' dehumidifiers range in price from $1,695 to almost $150,000. Matsui's resin dryers range in price from $5,000 to $60,000. The majority of Matsui's sales are of systems of more than one component. Both Munters and Matsui market their products through independent sales representatives. The evidence demonstrates that Matsui and Munters have no sales representatives in common. In addition, Munters' sales representatives sell to general contractors, and Matsui's sales representatives sell directly to buyers with technical backgrounds. We flatly reject plaintiff's suggested inference that because general contractors are "nontechni-

cal people" they are unsophisticated buyers. As Matsui demonstrates, and Munters' Director of Technology concedes, a buyer either will need a technical background or will need the assistance of someone with a technical background to understand the technical advertising literature in which Matsui describes its desiccant wheel as honeycomb-shaped and from which this lawsuit arose. The conclusion is inevitable that either a technically sophisticated purchaser, or at least a technically sophisticated assistant, will review Matsui's advertisements.

One of the plaintiff's witnesses noted that approximately 75,000 plastic-molding machines are spread among some 10,000 to 15,000 plastic molding plants in the United States. Of these plants, Munters could point to only one that contained both a Matsui plastic resin dryer and a Munters space dehumidifier.

Matsui has four main competitors: 1) Conair, Franklin Group; 2) AEC–Whitlock; 3) Universal Dynamics; and 4) Pacific Engineering, Novatec. These four competitors all carry the same product lines as Matsui, including resin dryers. Matsui and most of its competitors belong to the Society of Plastics Industry (SPI), an organization that promotes the use of plastics among consumers in the United States. The main requirement for membership is that a member must sell plastic machinery or materials or be a processor of plastic in the United States. Munters is not a member of SPI. In fact, Munters' Director of Technology stated that he did not know what the SPI was.

Matsui promotes its products through its sales representatives, through magazine advertisements, and through regional and national trade shows that it attends. Matsui has placed advertisements in three out of four of the major publications in the plastics industry and presents exhibits at national and regional trade shows.

Munters primarily directs its advertising to the heating and ventilation industry, a distinct industry from the plastics processing equipment industry. Munters advertises "HoneyCombe" products in various trade journals. However, Munters limits its promotion in the plastics industry to distribution of an application note, which explains how to prevent sweat on a chilled mold. Uncontroverted evidence shows that until December 9, 1987 Matsui had never heard of Munters or Cargocaire and was not aware that "HoneyCombe" was a registered trademark. By letter dated December 7, 1987 Munters' counsel advised Matsui of Munters' objection to Matsui's trademark use of "Honeycomb." The letter demanded that Matsui "cease and desist from all further uses of the term HONEY-COMB." After a period of negotiations, Mr. G. Gondoh, Matsui's Vice President, signed a May 26, 1988 letter from Munters' attorneys with the legend: "Subject to the terms of the May 2, 1988 letter, Matsui America, Inc. agrees that it will no longer use 'HONEYCOMB' as a trademark after November 1, 1988." In the referenced May 2, 1988 letter, Matsui's counsel proposed that:

> without any waiver of rights which MATSUI AMERICA, INC. has to use the subject words generally ... MATSUI AMERICA, INC. is willing to discontinue the use of the word HONEYCOMB in its advertising materials....

Pursuant to the May 1988 agreement, Matsui changed the name of its resin dryer from "Honeycomb DMZ Dehume Jet Dehumidifying Hot Air Dryer" to "DMZ Dehume Jet Dehumidifying Hot Air Dryer", removed the word "Honeycomb" from its products, and depleted its supply of product brochures for the "Honeycomb DMZ Dehume Jet Dehumidifying Hot Air Dryer." Matsui continued to use the word "honeycomb" as an adjective to describe its rotor in its advertising literature.

The most common definition of "honeycomb" is "a mass of hexagonal prismatic wax cells ... built by honeybees in their nest or hive to contain their brood and stores of honey." *Webster's Third New Int'l Dictionary.* As a noun, "honeycomb" is also "something that resembles a honeycomb in structure or appearance", *id.*, such as "a weave with a small allover pattern of raised squares, oblongs, or dia-

monds." *Id.* As a transitive verb, "honeycomb" means "to cause to be full of cavities like a honeycomb[; to] make into a tissue of holes separated by thin walls or partitions." *Id.* "Honeycomb" may also be used as an adjective, such as in "honeycomb coral" and "honeycomb sponge." *Id.* Cargocaire, in fact, used the word "honeycomb" in its book, "The Dehumidification Handbook", to describe the appearance of its desiccant wheel: "The rotary Honey-Combe unit functions in the same fashion as the rotary bed dehumidifier except that an absorbent (usually lithium chloride) is used, and the desiccant is impregnated into a honeycomb structure mounted within a cylindrical casing."

Munters presented no evidence of actual confusion on the part of Munters' customers or potential customers. Munters has not received any misdirected mail that was intended for Matsui and came to Cargocaire or Munters. Munters has never received a telephone call inquiry indicating confusion from a customer regarding the source of Munters' or Matsui's honeycomb rotor. Also, Matsui has not received any misdirected mail that was addressed to Cargocaire or any telephone inquiries indicating any type of confusion.

## III. DISCUSSION

This court has subject matter jurisdiction of the complaint and the counterclaim pursuant to 15 U.S.C. secs. 1114, 1116–1119, 1121, and 1125(a), 28 U.S.C. secs. 1331, 1332(a), and 1338(b). This court has personal jurisdiction over the parties. Venue is proper herein under 28 U.S.C. sec. 1391(b) and (c).

### A. *Trademark Infringement*

A cause of federal trademark infringement exists where a person uses 1) any reproduction, counterfeit, copy or colorable imitation of a mark; 2) without the registrant's consent; 3) in commerce; 4) in connection with the sale, offering for sale, distribution or advertising of any goods; 5) where such use is likely to cause confusion, or to cause mistake or to deceive. Lanham Act sec. 32(1) (15 U.S.C. sec. 1114(1)). *See*

*James Burrough Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266, 273–74 (7th Cir.1976).

A cause of action under sec. 43(a) of the Lanham Act exists in the following situation:

Any person who shall affix, apply, or annex, or use in connection with any goods or services ... a false designation of origin, or any false description or representation including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. sec. 1125(a).

### 1. Likelihood of Confusion

The crucial issue in this unfair competition and trademark infringement action based on secs. 32(1) and 43(a) of the Lanham Act and on common law is the likelihood of confusion on the part of the consuming public. *G. Heileman Brewing Co. v. Anheuser–Busch, Inc.,* 873 F.2d 985, 999 (7th Cir.1989); *Henri's Food Products Co, Inc. v. Kraft, Inc.,* 717 F.2d 352, 354 (7th Cir.1983). To determine whether a likelihood of confusion exists, the Seventh Circuit considers a number of factors, including:

1) the similarity of the marks;

2) the distinctiveness (or strength) of the marks in issue;

3) the similarity of the products;

4) the degree of care likely to be exercised by consumers;

5) the similarity of the channels of distribution;

6) the intent of the claimed infringer; and

7) the evidence of actual confusion.

*International Kennel Club v. Mighty Star, Inc.,* 846 F.2d 1079, 1087 (7th Cir. 1988); *Ziebart Int'l Corp. v. After Market Assocs.,* 802 F.2d 220, 226 (7th Cir.1986); *McGraw–Edison Co. v. Walt Disney Productions,* 787 F.2d 1163, 1167–68 (7th Cir. 1986); *Henri's Food Products,* 717 F.2d at

354; *Wesley–Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.*, 698 F.2d 862, 867 (7th Cir.1983). "None of these factors by itself is dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved." *International Kennel Club*, 846 F.2d at 1087; *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1187 n. 20 (7th Cir.1989) ("the importance of any single factor may vary between cases"); *McGraw–Edison*, 787 F.2d at 1168.[1]

### a. The Similarity of the Marks

■ In considering the similarities and differences between marks, the marks in their entireties must be compared in light of what occurs in the marketplace, not in the courtroom. *James Burrough*, 540 F.2d at 275. In the courtroom, "HoneyCombe" and "honeycomb" appear similar: they are identical in sound and derive from the same word, "honeycomb."

However, Munters' mark as used in the marketplace is different from Matsui's use of the word "honeycomb." First, Munters has chosen to misspell the common word "honeycomb" by adding an "e" and presenting it with a capitalized "H" and "C." We are mindful that "it is inappropriate to focus on minor stylistic differences in defendant's use of the allegedly infringing name." *International Kennel Club*, 846 F.2d at 1088. However, we do not focus solely on the difference between Munters' stylistic spelling of "Honey-Combe" and Matsui's nonstylistic use of "honeycomb." We also take note that Munters presents its mark "HoneyCombe" as a brand name for its dehumidifiers in conjunction with its company name, Mun-

ters, and division name, "Cargocaire." By contrast, Matsui does not use "honeycomb" in its brand name, "DMZ Dehume Jet." Matasui only uses the word "honeycomb" in the body of its advertising literature to describe one product: the rotor component. "Prominent display of different names on the marks ... reduce[s] the likelihood of confusion even where ... the marks are otherwise similar." *Ziebart Int'l*, 802 F.2d at 227; *McGraw–Edison*, 787 F.2d at 1168 (plaintiff and defendant's "TRON" marks "distinguishable" because manufacturer's name presented with mark).

Based on the evidence before us and considering the marks in light of what occurs in the marketplace, we find that the marks are not sufficiently similar to create a likelihood of confusion among purchasers as to the source of Matsui's products' origins.

### b. The Distinctiveness (or Strength) of Munters' Mark

■ Munters' trademark "HoneyCombe" is registered and incontestable. The Supreme Court has held that an incontestable mark cannot be invalidated in an infringement suit on the ground that it is merely descriptive. *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 105 S.Ct. 658, 667, 83 L.Ed.2d 582 (1985). For purposes of determining a mark's validity, it is conclusively presumed either that the mark is non-descriptive, or if so, has acquired secondary meaning. *Union Carbide Corp. v. Ever–Ready Inc.*, 531 F.2d 366, 377 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). Matsui does not challenge the *validity* of Munters' mark by arguing Munters' mark is merely descriptive. Rather, Matsui argues that there is no likelihood of confusion because the

1. In *Ziebart Int'l*, 802 F.2d at 226, the court noted that three factors were more important than the others, in the case before it, in determining the likelihood of confusion issue. The court in *G. Heileman Brewing*, 873 F.2d 985, relied on the *Ziebart Int'l* court's fact-specific determination in stating the following broad legal proposition:

> While there are a myriad of variables to be considered in determining whether a likelihood of confusion exists, the most important

factors include the similarity of the marks, the intent of the claimed infringers and the evidence of actual confusion.

*G. Heileman Brewing*, 873 F.2d at 999 (citing *Ziebart Int'l*).

We note only that the outcome of the case before us is the same whether we weigh the three specified factors in *G. Heileman Brewing* more heavily than the others, or whether we look at the facts before us in order to determine which factors we will accord more weight.

mark is merely descriptive. Trademark validity and likelihood of confusion are distinct issues. *See Schwinn Bicycle*, 870 F.2d at 1186–87; *Union Carbide*, 531 F.2d 366. As such, the courts in this Circuit hold that "an incontestability finding in no way concludes the confusion question." *Source Services Corp. v. Chicagoland JobSource, Inc.*, 643 F.Supp. 1523, 1532 (N.D. Ill.1986) (Shadur, J.); *Source Services Corp. v. Source Telecomputing*, 635 F.Supp. 600, 610 (N.D.Ill.1986) (Rovner, J.) ("the conclusive presumption that the marks [are non-descriptive, or if descriptive,] have secondary meaning established by the statutory incontestability of plaintiff's ... marks does not automatically transfer into a conclusive presumption of strength in a likelihood of confusion analysis"). Thus, Munters' mark's incontestability status does not settle the issue of the strength of "HoneyCombe." The strength issue "depends on the actual marketplace facts and cannot be resolved by resting on incontestability." *Chicagoland JobSource*, 643 F.Supp. at 1532 (citing *Source Telecomputing*, 635 F.Supp. at 610).

The court in *G. Heileman Brewing*, 873 F.2d at 991, set forth the analysis for assessing the strength of a mark. The court stated that "a term for which trademark protection is claimed generally fits somewhere in the spectrum of classifications ranging from (1) generic or common descriptive and (2) merely descriptive to (3) suggestive and (4) arbitrary or fanciful." *Id.* (citing *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978)).

A generic or common descriptive term is one which is commonly used as the name or description of a kind of goods. It cannot become a trademark under any circumstances....

A merely descriptive term specifically describes a characteristic or ingredient of an article. It can, by acquiring a secondary meaning, *i.e.*, becoming "distinctive of the applicant's goods" (15 U.S.C. sec. 1052(f)), become a valid trademark.

A suggestive term suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods. Such a term can be protected without proof of a secondary meaning.

An arbitrary or fanciful term enjoys the same full protection as a suggestive term but is far enough removed from the merely descriptive not to be vulnerable to possible attack as being merely descriptive rather than suggestive.

*Miller Brewing*, 561 F.2d at 79.

"HoneyCombe" as applied to Munters' dehumidifier and desiccant wheel is not a generic term. The mark does not "serve to denominate a type, a kind, a genus or a subcategory of goods." *Henri's Food Products v. Tasty Snacks, Inc.*, 817 F.2d 1303 at 1306 (7th Cir.1987). "HoneyCombe" is not a word "which in any way serves to classify the noun ['dehumidifier' or 'wheel'] to which it is attached." *Id.* Rather, "HoneyCombe" describes or suggests (*see infra*) a characteristic—the porous configuration—of the goods. It does not represent a subcategory or kind of wheel or dehumidifier. *See A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 906 (7th Cir.1986). Further, although minor stylistic changes (notably the addition of an "e" at the end of "HoneyCombe") are not determinative, we note that these changes push the word farther from generic status into the realm of trademarks.[2]

"HoneyCombe" also is not fanciful or arbitrary. The dictionary definition of "honeycomb" clearly relates to the porous configuration of Munters' wheel. "HoneyCombe" is not far enough removed from the description of one salient feature—the

---

**2.** This court denies defendant's motion to amend its answer and counterclaim, in which Matsui challenges Munters' use of "HoneyCombe" as a valid trademark. Specifically, Matsui contends that "HoneyCombe" is a generic term and as such should no longer be allowed

its incontestable status as a registered trademark. For the stated reasons, we believe Munters' trademark is not a generic use of the term with respect to its dehumidifier and, therefore, we believe that its trademark is valid.

porous configuration—of Munters' dehumidifier that we could classify it as fanciful or arbitrary.

Munters' trademark "HoneyCombe" is registered for "dehumidifying apparatus." Munters considers both its desiccant wheel and its dehumidifier covered by this registration.

■ The issue then boils down to whether "HoneyCombe" is descriptive or suggestive. A considerable body of law has developed attempting to distinguish merely descriptive marks from suggestive marks. Much of this law is devoted to whether the mark at issue is valid, a question that a court must answer affirmatively before the court tackles the second broad element in trademark infringement cases: whether a likelihood of confusion exists as to the valid mark. *See, e.g., G. Heileman Brewing*, 873 F.2d at 996–97. In the validity analysis, a suggestive mark is valid per se and entitled to protection against infringement. A descriptive mark is not valid per se and must be accompanied by secondary meaning—an evidentiary demonstration of recognition of the mark's strength—to receive protection. A descriptive mark without secondary meaning is not valid and not entitled to protection against infringement.

Our slightly different purpose here is to determine whether in light of the other digits of the likelihood of confusion test the Munters mark has sufficient strength to create a likelihood of confusion among the relevant consuming class. To that end, this analysis merely determines where along the continuum of mark strength "HoneyCombe" falls.

The strength of "HoneyCombe" is different when applied to Munters' desiccant wheel than when applied to its entire dehumidifier. "HoneyCombe wheel" and "HoneyCombe rotor" specifically and directly describe a characteristic of the desiccant wheel: the wheel's porous configuration. We therefore find that as applied to the desiccant wheel, "HoneyCombe" is merely descriptive. As the Seventh Circuit stated recently: "A suggestive term, as the word implies, suggests rather than de-

scribes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Id.* at 996. A potential purchaser needs no imagination to associate the word "Honey-Combe", which means "a tissue of holes separated by thin walls or partitions", with the rotor's configuration. The court in *Union Carbide*, 531 F.2d at 379, stated that "generally speaking, if the mark imparts information directly, it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive" (quoting A. Seidel, S. Dalroff, and E. Gonda, *Trademark Law and Practice* sec. 4.06 at 77 (1963)); *see also M.B.H. Enterprises, Inc. v. WOKY, Inc.*, 633 F.2d 50 (7th Cir.1980). Also, the word "honeycomb" is used both inside and outside the plastics industry and dehumidification industry to describe products consisting of multi-cellular configurations of various shapes. Munters' argument that "honeycomb" is not necessary to describe, nor directly describes, Matsui's rotor because the openings are not hexagonal and do not resemble the honeycomb in a beehive is too restrictive a reading of the various dictionary definitions of "honeycomb." Under this test we find that Munters' mark "HoneyCombe", when applied to its desiccant wheel, is descriptive, and thus relatively weak.

A descriptive mark's inherent weakness may be bolstered by showing the relevant purchasing class recognizes the mark as indicating the source of the mark's origin, that is, showing secondary meaning. Munters, however, introduced little extrinsic evidence demonstrating the strength of "HoneyCombe." Rather, Munters relied primarily on its incontestability status. Munters also introduced an undifferentiated mass of information purportedly indicating the amount and nature of advertising of the mark, the length of time the mark has been in use, and the amount of goods sold under the mark. However, as Matsui demonstrated, only a very small proportion of Munters' advertising figures are attributable to advertising its dehumidifier di-

rected at the plastics industry, and only a small number of the demonstrated sales were to the plastics industry. This minimal circumstantial evidence does little to convince us that the relevant buyers are aware of Munters' mark. Again, we emphasize that our inquiry is not as to Munters' mark's validity. Rather, here we only analyze the strength of "HoneyCombe" as applied to Munters' desiccant wheels. As such, Munters' incontestability status is not conclusive as to the secondary meaning issue. We find that Munters has not offered sufficient evidence of recognition of its mark to make a prima facie case of secondary meaning. We therefore conclude that Munters' descriptive mark "HoneyCombe", as applied to its desiccant wheel, is not bolstered by any secondary meaning.

"HoneyCombe" is stronger when applied to the entire dehumidifying unit than when applied to the desiccant wheel. A certain amount of imagination is needed to associate "HoneyCombe" with the dehumidifier itself. Thus the mark as applied is suggestive. Although the desiccant wheel may fairly be described as honeycomb-shaped, the dehumidifier's only relationship to "honeycomb" is the configuration of the wheel. This is not to say Munters' use of "HoneyCombe" in connection with the dehumidifier is arbitrary or fanciful. Rather the mark suggests a characteristic of the dehumidifier: its wheel configuration. This finding is of only limited value to the plaintiff here, however, given Matsui's use of "honeycomb" is only in connection with the wheel, not its resin dryer, and given the other factors herein delineated.

### c. The Similarity of the Products

■ The question with respect to this factor of likelihood of confusion is whether the products are the kind the purchasers and users of the goods attribute to a single source. *McGraw–Edison*, 787 F.2d at 1169. There is a direct correlation between product similarity and likelihood of confusion: "the more closely products are related the more likely sources may be confused." *Union Carbide*, 531 F.2d at 382. However, "[t]he fact that the products at issue may be 'very different' is not dispositive of the issue of similarity of the products in determining the existence of a likelihood of confusion between products." *Id.* In the spectrum of similarity, the case law has created three categories of products, listed in order of descending similarity: 1) competitive, 2) noncompetitive but related, and 3) noncompetitive and nonrelated. A likelihood of confusion may exist for competitive products and for noncompetitive but related products.

As a factual matter, we find that Munters' dehumidifier and desiccant wheel are not competitive with Matsui's resin dryer and desiccant wheel. Despite Munters' protestations to the contrary, the evidence shows that the two products are not interchangeable and purchasers do not substitute Munters' products with Matsui's products. Munters' dehumidifier is designed and used for space dehumidification. Matsui's product is considerably more specialized and is used exclusively for plastic resin drying. The only evidence that Matsui's dehumidifier can serve the same function as Munters' is one incident in which a Munters dehumidifier was substantially altered. Aside from this example, the evidence demonstrates that Matsui's and Munters' products are not interchangeable.

Products need not be directly competitive for a likelihood of confusion to exist. Consumers may confuse similar marks on noncompetitive but related goods. In determining whether Munters' and Matsui's products are related we analyze degree, not kind. In some, albeit nonmeaningful, sense all products are related. For our purposes, however, we must determine whether the products are sufficiently related so that consumers will confuse Matsui's use of "honeycomb" to describe the configuration of its desiccant wheel as emanating from Munters.

We find as a factual matter that Munters' and Matsui's products here are not sufficiently related to give rise to confusion. Munters would wish us to categorize the relevant market as "auxiliary plastics machinery", and thus find the products strongly related. The facts, however, belie

such a finding. Munters does not carry a resin dryer or any of the other auxiliary equipment offered by Matsui. Material drying is a separate market into which Munters has not ventured. Although we recognize that the products before us are not completely unrelated, we find that they are sufficiently unrelated and dissimilar that Matsui's use of "honeycomb" in describing its wheel would not cause any confusion among the relevant class of buyers.

### d. The Degree of Care Likely to be Exercised By Consumers

Where the cost of the trademarked product is high, the courts assume that purchasers are more likely to be discriminating than they otherwise might be. *Source Telecomputing*, 635 F.Supp. 600 (*citing Maxim's Limited v. Badonsky*, 772 F.2d 388, 393 (7th Cir.1985)). As discussed above, we find that the purchasers of the products here are sophisticated and discriminating. We are convinced that considerable expense and planning is involved in purchasing ventilation equipment and material handling systems. We therefore find that the degree of care likely to be exercised by industrial purchasers of these products does not support a finding of likelihood of confusion. In addition, due to the degree of sophistication of the purchasers of this equipment, and the resulting high degree of care exercised, we accord great weight to this factor in the analysis. Much of the case law regarding the likelihood of confusion issue has developed in response to products marketed to a wide and unknowledgeable consuming public. This is clearly not the case before us.

### e. The Similarity of the Channels of Distribution

Munters and Matsui distribute their products to their respective customers through their direct sales forces and through sales representatives. The evidence establishes that there is no overlap in sales representatives. Further, there is no evidence that any common retail outlet or distributor carries both Munters' space dehumidifier and Matsui's resin dryer.

As discussed above, we find that Munters' space dehumidifier and Matsui's resin dryer are in two separate markets. We also find that the two channels of trade are substantially distinct. We note that Munters' argument that it markets its dehumidifier to the same customers who buy Matsui's resin dryer is not without merit. However, Munters can point to only one processing plant that used its dehumidifier and a resin dryer of any manufacturer. As a result, we find that the channels of distribution are sufficiently dissimilar that this element of the likelihood of confusion does not help the plaintiff.

### f. The Intent of Matsui

A showing by plaintiff of bad faith intent on the part of alleged infringer is another factor that supports a finding of likelihood of confusion. *Ziebart Int'l*, 802 F.2d at 227. Munters does not challenge Matsui's assertion that it, Matsui, originally adopted the word "honeycomb" without knowledge of Munters' previous use. Rather, Munters argues that the court should infer from Matsui's intentional, continued use of the word "honeycomb" "after notice from plaintiff and after agreeing to terminate such use" that Matsui had bad faith intent. The position of the Seventh Circuit on this question is clear: "it is lawful to use a mark that does not infringe some other; intentional infringement creates some problems, but intentional use of a mark that [the defendant] had every right to use is not itself a ground on which to draw an adverse inference." *M-F-G Corp. v. EMRA Corp.*, 817 F.2d 410, 412 (7th Cir.1987).

Also, mere knowledge on the part of the defendant of the plaintiff's mark and the defendant's refusal to relinquish its mark upon demand are not necessarily indicative of bad faith. Those actions could also be explained by a good faith judgment on the part of the defendant that its use does not infringe the plaintiff's mark. *Source Telecommuting*, 635 F.Supp. at 614. We will not make an inference of bad faith from evidence of conduct that is compatible with

a good faith business judgment. Absent any evidence of bad faith, we find that this element of the mark's strength does not point to a likelihood of confusion.

### g. The Evidence of Actual Confusion

Actual confusion is the best evidence of likelihood of confusion. *Union Carbide,* 531 F.2d at 383. Munters presented none of this evidence. Munters offered no evidence of misdirected mail, or of telephone calls or inquiries indicating confusion from customers or potential customers. Also, Munters did not present any survey evidence indicating confusion. *See McGraw–Edison,* 787 F.2d at 1172–73. Munters' only evidence of actual confusion was the testimony by its Director of Technology that Munters' own sales representatives were confused by Matsui's use of the word "honeycomb" as to whether Matsui was using Munters rotors. The purpose of the likelihood of confusion test is to determine the confusion of consumers, or potential consumers, as to the source of the goods in question. We give very little weight to the evidentiary inference Munters would apparently like us to make: customers are or will be confused because Munters' sales representatives are confused.

After considering and weighing all the factors, as set forth by this Circuit, and viewing the totality of the circumstances, we reach the conclusion that the facts do not sustain a finding that the current and potential purchasers and users of Munters' and Matsui's products are likely to be confused as to the source of the respective goods being rendered by Munters under the mark "HoneyCombe" and Matsui's use of the word "honeycomb." Accordingly, we find that Munters' Lanham Act claim and pendent state and common law claims

relating to infringement and unfair competition are without merit since proof of likelihood of confusion as to the source is essential to prevail on any of these causes of action.[3]

### 2. Fair Use Doctrine

 Section 33(b) of the Lanham Act provides that if a registered mark has become incontestable, as is the case here with Munters' mark "HoneyCombe", "the registration shall be conclusive evidence of the registrant's exclusive right to use the registered mark." 15 U.S.C. sec. 1115(b). The Act subjects this general rule to seven explicit defenses, one of which is the "fair use" defense. 15 U.S.C. sec. 1115(b)(4). The Lanham Act provides this defense against valid trademarks when the term is not being used as a trademark by the party charged with infringement and is used in good faith to describe the product to its customers. *A.J. Canfield,* 796 F.2d at 908; *M.B.H. Enterprises,* 633 F.2d 50. Section 33(b)(4) of the Lanham Act reads:

> That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a trade or service mark, of the party's individual name of anyone in privity with such a party, or of a term or device which is descriptive of and used fairly and in good faith only to describe to users the goods or services of such party, or their geographic origin....

15 U.S.C. sec. 1115(b)(4). Therefore, to sustain on the fair use defense the defendant must establish three elements: 1) that the defendant used the word or symbol merely to describe its product; 2) that it did not use the word or symbol as a trademark; and 3) that it used the word or symbol in question in good faith. Matsui has satisfied each of these elements. *Ac-*

---

**3.** The Illinois Deceptive Trade Practices Act defines as deceptive conduct that which:

> (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;
> (3) causes likelihood of confusion or of misunderstanding as to the affiliation, connection, or association with or certification by another.

Ill.Rev.Stat. ch. 121½, sec. 312.

Under this act, which codified the Illinois common law of unfair competition, a defendant is liable only if the plaintiff can establish a likelihood of confusion between the parties' products. In addition, " '[l]ikelihood of confusion' has the same meaning in unfair competition cases under the Deceptive Trade Practices Act as it has in traditional infringement cases." *McGraw–Edison,* 787 F.2d at 1173–74 (*quoting Hooker v. Columbia Pictures Industries, Inc.,* 551 F.Supp. 1060, 1064 (N.D.Ill.1982)).

*cord, Ringling Bros.–Barnum & Bailey v. Celozzi–Ettelson,* 855 F.2d 480, 484 (7th Cir.1988) (court omitted non-trademark element).

First, Matsui uses "honeycomb" merely to describe its desiccant wheel. Matsui does not use "honeycomb" in its advertising literature to describe its resin dryer, but rather uses it only to describe its wheel. Therefore, Munters' argument that "honeycomb" does not directly describe Matsui's dryer is misplaced. As discussed previously, "honeycomb" directly describes the desiccant wheel's configuration. A cross section of the wheel resembles "a tissue of holes separated by thin walls or partitions." *Webster's Third New Int'l Dictionary.* Although the most common definition of "honeycomb" is a "mass of hexagonal prismatic wax cells ... built by honeybees", *id.,* "honeycomb" is also clearly descriptive of the properties of Matsui's wheel.

Second, we find that Matsui does not use the word "honeycomb" as a trademark. A trademark is any "word, name, symbol, or device" used by a manufacturer or merchant "to identify his goods and distinguish them from those manufactured by others." 15 U.S.C. sec. 1127. The evidence does not establish that "honeycomb" identifies or distinguishes Matsui's resin dryer or its desiccant wheel. As discussed previously, Matsui uses the word "honeycomb" accurately and merely to describe the wheel's configuration.

Third, Matsui used "honeycomb" in good faith. For the reasons discussed previously, we find that Munters has failed to establish bad faith intent on Matsui's part. The only evidence Munters presents is inferential: Matsui's continued use of the word "honeycomb" after the May 1988 agreement. However, as we stated, this conduct, without more, does not demonstrate bad faith. No evidence presented convinces us that Matsui's actions were not made within the context of good faith business judgment.

We therefore hold that Munters' Lanham Act claims are barred by the explicit fair use defense enumerated in the Lanham Act.

### B. *Illinois' Anti–Dilution Statute*

The Illinois Anti–Dilution Act provides:

> Every person ... adopting and using a mark [or] trade name, ... may proceed by suit, and the circuit court shall grant injunctions, to enjoin subsequent use by another of the same or any similar mark [or] trade name ... if there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark [or] trade name ... of the prior user notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services.

Ill.Rev.Stat. ch. 140, para. 22 (1981). This Act "prevents the gradual whittling away of trademarks' distinctiveness through use by third parties on non-confusing, non-competing products." *Ringling Bros.,* 855 F.2d at 482. The court must issue an injunction if: 1) the prior user shows a likelihood of injury to reputation; *or* 2) the prior user shows that the mark is distinctive and that the subsequent user's use dilutes that distinctiveness. *McGraw–Edison,* 787 F.2d at 1174; *Hyatt Corp. v. Hyatt Legal Services,* 736 F.2d 1153, 1157 (7th Cir.), *cert. denied,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 361 (1984).

### 1. Injury to Reputation

Munters argues that because it does not control the quality of Matsui's products in connection with the word "honeycomb", there exists a likelihood of injury to Munters' business reputation. However, nothing in the Illinois statute or the relevant case law equates the mere loss of control with injury. Although a subsequent user may detrimentally effect the business reputation of the prior user, the opposite result is equally plausible. The subsequent user may enhance the prior user's reputation. The two issues, control and reputation, can be, and are here, mutually exclusive.

Munters has not offered any evidence to suggest that Matsui's use of "honeycomb" in connection with its dryer will injure

Munters' reputation. In fact, the evidence demonstrates the opposite conclusion. Matsui enjoys a reputation, which is here unchallenged, as a marketer and distributor of high quality plastic processing equipment. Munters offered no evidence to prove that Matsui's use of the word "honeycomb" had injured Munters' reputation or to suggest it would likely be injured in the future.

### 2. Dilution of Distinctiveness

The analysis of a mark's distinctiveness under the anti-dilution statute is similar to the analysis of its strength under the likelihood of confusion test of the Lanham Act.

Because the validity of Munters' mark is again not in question, our analysis here is not to determine the merits of a challenge to "HoneyCombe." Rather, we are here concerned with the relevant buying class' current recognition, or lack thereof, of Munters' mark and whether Matsui's use of "honeycomb" will detrimentally effect that recognition. *See Exxon Corp. v. Exxene Corp.*, 696 F.2d 544, 550 (7th Cir.1982) (court notes that without anti-dilution statute "mental image would be blurred" of first user's mark). Although this is not an analysis of the likelihood of confusion, the focus of inquiry is similar: the effect of Matsui's use of "honeycomb" upon actual or potential purchasers of Munters' products.[4] Therefore, the fact that Munters' mark "HoneyCombe" is registered and incontestable does not, for the sake of this analysis, help. Instead, we adopt for purposes of determining the dilution of "HoneyCombe"'s distinctiveness, the reasoning previously discussed. For this purpose only we find Munters' mark in connection with its desiccant wheel weak, and in connection with its dehumidifier somewhat stronger.

We next address whether Matsui's use of "honeycomb" will dilute the commercial magnetism of Munters' mark. *See Polaroid Corp. v. Polaraid Inc.*, 319 F.2d 830, 836 (7th Cir.1963) ("dilution is an infection which, if allowed to spread, will inevitably destroy the advertising value of the mark"). We find it will not. "Important factors in this determination [of dilution] are the similarity between the marks used by the parties, and the extent of the marketing effort by the second user." *Hyatt*, 736 F.2d at 1158, (*citing Polaroid*, 319 F.2d at 832); *Instrumentalist Co. v. Marine Corps League*, 509 F.Supp. 323, 323 (N.D. Ill.1981)). First we note our previous discussion of the two marks' similarities. Second, the *Hyatt* court notes and the plain language of the statute makes clear this anti-dilution statute anticipates the gradual erosion of the strength of a trademark by another trademark. As we noted earlier, Matsui does not use "honeycomb" as a trademark. Consequently, a second important indicia of dilution, the marketing effort by Matsui, is in this context a *non sequitur*: Matsui does not market its products under "honeycomb." The purpose of this Act is presumably not to stifle the non-trademark use of descriptive words. Rather, this statute protects trademarks in cases in which the likelihood of confusion is too slight to warrant injunction, but in which a second user waters down the effectiveness of the first user's mark. We are not faced with this scenario in the case before us. Munters' mark is not strong, and Matsui's use of "honeycomb" does nothing to detract from the magnetism of Munters' mark. We therefore find that Matsui's use of the word "honeycomb" does not dilute whatever distinctiveness Munters' mark "HoneyCombe" possesses.

**4.** The Seventh Circuit has not established whether "distinctiveness" means something different under the Illinois Anti–Dilution Act from under the Lanham Act. In *Ringling Bros.*, 855 F.2d at 483, the court considered the argument suggesting such a distinction "unique" and of "dubious merit." However, the court did not reach the merits of this issue.

We have chosen to analyze "distinctiveness" under the likelihood of confusion test of the Lanham Act, under which "HoneyCombe"'s

conclusive presumption of distinctiveness is not determinative. If we were to define "distinctiveness" under the Anti–Dilution Act as it is defined for validity purposes under the Lanham Act, our finding would be different: we would conclusively presume "HoneyCombe" distinctive. In either case, our outcome here would be the same because the Anti–Dilution Act applies only to trademarks, which Matsui's use of "honeycomb" is not.

## C. *Breach of Contract*

Munters further argues that Matsui breached an agreement signed in May 1988 between the two parties when Matsui continued to describe its desiccant wheel in advertising literature using the word "honeycomb." Munters contends the agreement required Matsui to cease using any form of the word "honeycomb." Matsui counters by arguing that the agreement incorporated by reference an earlier accord in which Matsui agreed to cease using "honeycomb" in its trademark capacity but reserved the right to continue using "honeycomb" in its non-trademark sense.

We do not need to resolve the ambiguity of this agreement because the scope of relief sought by Munters—that this Court enjoin Matsui from continued use of "honeycomb" in trademark form—is the same as Matsui's interpretation of its obligations under the agreement. Munters does not seek to enjoin Matsui from any and all use of the word "honeycomb"; it seeks only to enjoin Matsui's infringement of Munters' mark. For the reasons we have previously stated, we hold that Matsui's use of the word "honeycomb" in its non-trademark sense in its advertising literature does not infringe Matsui's use of "HoneyCombe." Thus Matsui's post-agreement conduct does not exceed the relief sought here by Munters.

## IV. CONCLUSION

For the above reasons we deny the plaintiff's motion for permanent injunction to the extent defendant continues only to use the word "honeycomb" in its non-trademark form to describe fairly the configuration of its desiccant wheel located within its resin dryer. We also deny the defendant's motion to amend its answer and counterclaim challenging the registration status of the plaintiff's valid trademark.