**ZIEBART INTERNATIONAL CORPORATION, Plaintiff-Appellant,**

v.

**AFTER MARKET ASSOCIATES, INC. and the Protector Corporation, Defendants-Appellees.**

No. 84–2408.

United States Court of Appeals, Seventh Circuit.

Argued May 23, 1985.

Decided Sept. 10, 1986.

William J. Schramm, Burton, Parker & Schramm, Mount Clemens, Mich., for plaintiff-appellant.

Myron C. Cass, Silverman, Cass & Singer, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, WOOD, Circuit Judge, and WYATT, Senior District Judge.[*]

* The Honorable Inzer B. Wyatt, Senior District Judge for the Southern District of New York, is sitting by designation.

WYATT, Senior District Judge.

This is an appeal by plaintiff ("Ziebart"), said in the notice of appeal to be "from the final judgment entered on the first day of August, 1984." The five claims in the complaint were for infringement of registered trademarks and service marks (presumably claimed to be in violation of 15 U.S.C. § 1114(1)), for "common law infringement", for "common law unfair competition", for "false designation of origin", said to be in violation of 15 U.S.C. § 1125(a), and for "dilution", said to be in violation of the Illinois Anti-Dilution Act, Ill.Rev.Stat. ch. 140, § 22 (1981). The business of Ziebart is the making and selling of "vehicle preservatives," mainly for automobiles; a major part of the business was "the licensing of others to provide vehicle preservation services, including rustproofing services ..." (Complaint, para. 4). The conduct complained of is the use of an "armoured knight motif design consisting of a helmet and shield to advertise the sale of vehicle rustproofing services and vehicle preservatives ..." (Complaint, para. 7). Such conduct is said to infringe the federally-registered trademarks and service marks and to violate the common law and state statutory rights of Ziebart in an "armoured knight motif" when used in the sale of vehicle rustproofing goods and services (Complaint, paras. 11, 14, 16, 20, 23).

The district court had jurisdiction under 15 U.S.C. § 1121 of the principal claim and of the false designation of origin claim and had jurisdiction of the other claims under pendent jurisdiction principles; there also appears to be diversity jurisdiction. We have jurisdiction of the appeal under 28 U.S.C. § 1291.

The trial was without a jury before Judge Leighton on May 10, 29, 30, and 31, 1984. At the conclusion of the trial on May 31, Judge Leighton made oral findings and conclusions, ending with a statement that "as to all the counts in the complaint, there will be judgment entered for the defendant...." On August 1, 1984, Judge Leighton filed written findings of fact and conclusions of law. These findings and conclu-

sions, together with an order and a judgment for defendant, all dated August 1, 1984, were entered in the docket on August 7, 1984. It is from the judgment so entered (and not entered on the date stated in the notice of appeal) that this appeal is taken. We affirm the judgment below.

1a.

There are some preliminary procedural matters which should be mentioned.

Ziebart, a Michigan corporation with its principal place of business in Michigan, commenced the action against one defendant, After Market Associates, Inc. ("After Market"). After Market was an Illinois corporation with its principal place of business in Illinois. According to "uncontested facts" stipulated in the final pretrial order, After Market was dissolved as a corporation on December 31, 1980, before this action was commenced on January 6, 1981.

The answer filed for "defendant," presumably After Market, stated among other things, that "the proper party in interest is The Protector Corporation, a Delaware corporation ... assignee of After Market...." It appeared from the "uncontested facts" that Protector had its principal place of business in Illinois, and that the assignment of After Market to Protector occurred on June 20, 1980.

After the action was commenced, there was continuous confusion as to whether there was one defendant, After Market, or there were two defendants, After Market and Protector. Immediately before the trial, it was stipulated and "so ordered" by Judge Leighton that Protector "be added as a party Defendant", but nothing was then done to accomplish this. On June 26, 1984, a stipulated amendment to the complaint and an order of Judge Leighton were filed to the effect that the complaint be amended to show "on its face" that there are two defendants, After Market "and its successor corporation," Protector.

The decision of the district court and the judgment entered on that decision were "for the defendant", in the singular. It seems that, considering the apparent agree-

ment of Ziebart, After Market, and Protector, the simplest way to clear up the confusion is for us to treat as established that there are two defendants in this action—After Market and Protector, that they are both parties to the action, and that both are bound by, and entitled to the benefit of, the judgment. For simplicity, the two parties defendant will be referred to as "Protector"; for the period before June 20, 1980 (date of the assignment), the word "Protector" will refer to After Market and, for the period subsequent to June 20, 1980, will refer to Protector.

### 1b.

A further procedural matter is the stenographic transcript of the trial, which should be (Fed.R.App.P. 10(a)), but is not in fact, part of the record on appeal and was not transmitted to this court by the clerk of the district court.

It appears that the trial transcript was ordered by the parties on a daily basis during the trial (May 10, 29–31, 1984). The relevant statute (28 U.S.C. § 753(b)) requires that when any trial transcript is made, the reporter "shall promptly" deliver to the district court a certified copy of that transcript. No such delivery was made "promptly", and, when the initial transmission of the record on appeal was made on September 6, 1984, the trial transcript had not been delivered to the district court clerk and was not part of the initial transmission of the record on appeal. According to the docket of the district court, the trial transcript (in five volumes) was filed in the district court on October 9, 1984. The Rules of this Circuit (No. 4(a)(1)) require that when trial transcripts are filed after initial transmission of the record to this court, "they shall be immediately transmitted to this Court...." In the appeal now before us, the trial transcript has never been transmitted to this court; apparently it has been lost in the district court.

To remedy this situation, the parties to this appeal have stipulated that a copy of the trial transcript supplied by one of them is "a true copy" and may be used by us "in lieu of the official transcript". The transcript as received by us is in five volumes. Because the pagination of Volumes 2 through 5 of the transcript (pages 1–324) is separate from the pagination of Volume 1 of the transcript (pages 1–132), our system of citation must be explained. Volume 1 is the transcript for May 10, 1984, and will be cited as "1T [page(s)]". Volume 2 is the transcript for May 29, 1984, and will be cited as "2T [page(s)]". Volume 3 is the transcript for May 30, 1984 (morning), and will be cited as "3T [page(s)]". Volume 4 is the transcript for May 30, 1984 (afternoon), and will be cited as "4T [page(s)]". Volume 5 is the transcript for May 31, 1984, and will be cited as "5T [page(s)]".

### 1c.

A final procedural matter is that the text of the findings and conclusions as originally filed by Judge Leighton on August 1, 1984, is not part of the record on appeal and has not been transmitted to this court. Counsel for Protector by letter dated August 9, 1984, suggested to Judge Leighton three corrections in the findings and conclusions as originally filed by him. Judge Leighton accepted these suggestions, and by order dated August 17, 1984 (entered in the docket as item 94 on August 20, 1984), the findings and conclusions originally filed were "withdrawn to correct typographical errors", and corrected findings and conclusions were filed "nunc pro tunc". The findings and conclusions originally filed were not included in the initial transmission of the record on appeal to this court; nor were they transmitted subsequently. In order to enable us to see the findings and conclusions as originally filed, we have caused a certified copy of them to be transmitted by the clerk of the district court to this court.

### 2.

The relevant background facts do not appear to be contested to any substantial extent. They are mostly stipulated, are set out in the pretrial order, and make up a large part of the findings below. Because of the volume of evidence and of the somewhat confusing nature of the business op-

erations of the parties, it is difficult to give a simple description of the controversy.

Ziebart takes its name from a Kurt Ziebart who developed a rustproofing process, useful for (among other things) automobiles and other motor vehicles such as trucks and vans (the word "automobiles" or "cars" is used hereafter to include all such vehicles). Where the process was developed is not made to appear; presumably it was not in this country. In 1963, Kurt sold the name and the rustproofing process to Ziebart Process Corporation, of which plaintiff-appellant Ziebart is the successor.

Ziebart makes and sells in the United States appearance and protection products for automobiles, principally rustproofing compounds; it makes and sells other products such as polishes, cleaners, waxes and the like. The only competing products in the case at bar are rustproofing compounds, the only products sold by both Ziebart and Protector. Our attention must therefore be directed to rustproofing compounds for automobiles.

Ziebart sells rustproofing compounds in bulk and in consumer packages only to licensed dealers, often called "licensees" or "franchisees". Apparently, these licensees operate under the Ziebart name and sell only Ziebart products; rustproofing compounds are among the principal of these products. The licensed dealers are not owned by Ziebart; their ownership is in persons or entities independent of Ziebart. The licensees, as an important part of their business, offer rustproofing *services*; an owner of a car can turn it over to the licensee for rustproofing with a Ziebart compound; licensees are encouraged and trained by Ziebart to do this. If the car owner prefers to do the rustproofing himself, a Ziebart compound can be purchased in a package from the licensee and then applied by the car owner.

The Ziebart rustproofing business in the United States began in the mid–1960s; this appears from the claims to "first use" of the Ziebart marks in suit contained in applications by Ziebart for the registration of those marks.

The registered marks on which Ziebart here bases its claims are two service marks and two trademarks.

The first, a service mark (PX1; "PX" references are to numbers of the exhibits for Ziebart), is a helmet (suggestive of those used by medieval knights in armor) and a shield with the word "Ziebart" shown prominently in a diagonal across the shield. The helmet faces left.

The second, a service mark (PX2), is a helmet (facing right) with the word "Ziebart" displayed below.

The third, a trademark (PX3), is substantially the same as the first except much larger.

The fourth, a trademark (PX4), is the same in size and overall design as the third except that there is cross-hatching within the design perimeters and that the word "Ziebart" is not shown on the shield. It is uncontested, however, that this mark "is displayed only in proximity to the word 'Ziebart' on Ziebart's packaged products sold at retail level" (PTO attachment 1, para. 10; PTO references are to the Pretrial Order); for all practical purposes, therefore, it is the same as though "Ziebart" was a part of the mark itself, as is the case with the other three Ziebart registered marks.

The service marks were registered by Ziebart in 1968 and 1969; the trademarks were registered by Ziebart in 1979.

In its brief to this court, Ziebart often describes its marks as an "armoured knight motif" or "knight motif" (e.g. Brief, pp. 1, 4, 5, 7, 8, etc.); the description is inexact. The marks are simply the design of an armoured helmet and shield; there is no figure of a knight. There may be some suggestion of a knight from the helmet, but the suggestion is vague at best.

The evidence, as we view the record, shows that, except for one exhibit (PX52, an orange and black plastic litter bag), Ziebart uses only the colors yellow and blue for its marks; the finding below was

based on the stipulated facts and was that Ziebart used "primarily" yellow and blue.

The Ziebart marks in yellow and blue appear on its rustproofing compounds sold in packages at retail by licensees to car owners. When a Ziebart rustproofing compound is applied to a car by a Ziebart licensee, a yellow and blue Ziebart helmet mark with the word "Ziebart" on a sticker is placed on a window of the car.

It was found and is not here disputed that the word "Ziebart" is an integral and "important" feature of appellant's marks.

It is uncontested that many companies in the United States use a "knight's helmet" design as part of a trademark or service mark; other companies use a knight's helmet in marks registered for automobile related products.

The evidence indicates that, beginning about 1965 to the present, Ziebart has enjoyed a good reputation in the United States as a well known and successful provider of rustproofing products and services for automobiles, operating entirely through licensed dealers. Ziebart has spent substantial sums in promoting the sale of its rustproofing products and services, and the volume of sales resulting has likewise been substantial.

### 3.

The business of Protector began in March 1978 with the incorporation of its predecessor, After Market Associates, Inc.

The word "aftermarket" (one word, not two) is defined by a standard dictionary (Webster's Third International, p. 38) as follows: "the market for parts and accessories for a manufactured article (as an automobile) for repair and replacement as distinguished from the use of such parts as original components". The term "aftermarket" figured prominently, and was used frequently, in the opinion in *Ford Motor Co. v. United States*, 405 U.S. 562, 565–67, 571, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972).

Protector does not itself manufacture anything, but it buys from others products for automobiles which it then packages under its own name, trademarks and service marks, and introduces such products into the chain of distribution for sale.

The only products which Protector markets in competition with those of Ziebart are rustproofing compounds.

Protector employs for its sales a trade channel entirely different from that employed by Ziebart. Protector sells its rustproofing compounds only to distributors of aftermarket products to new car dealers (3T 156); these distributors in turn sell the Protector rustproofing compounds to new car dealers. The new car dealers offer rustproofing services in connection with their sales of new cars, using Protector rustproofing compounds in performing such services, or, in some instances, sell Protector rustproofing compounds at retail to customers who themselves apply those compounds to their cars. Protector itself, however, has no licensed dealers, operates no facilities for the application of its rustproofing compounds, and has no contacts with the new car dealers who buy such Protector compounds from distributors of aftermarket products. Protector does, however, supply (through its distributors) rustproofing training manuals and window stickers for use by new car dealers in promoting their rustproofing services.

We have difficulty in determining, from Ziebart's argument, what marks or usages of Protector are claimed to infringe Ziebart's marks. The "primary" offenders (Ziebart Brief, p. 6) seem to be the two window stickers, apparently developed by Protector in 1979, received in evidence as PX16 and PX16a. The two are very similar, but PX16a is said by Ziebart (Brief, p. 6) to be Protector's "primary symbol" and to be "updated" from PX16. It (PX16a) is described by Ziebart (Brief, pp. 6–7) as follows: it "features a helmet on top of a cartouche in which is found the words 'The Protector'" (The word "cartouche"—a French word—is defined in relevant part in a standard English dictionary as follows: "an oval figure containing the name or title of a ruler or deity" (Webster's New World Dictionary (college ed.) p. 225) ). The origi-

nal exhibit is in color and, according to testimony at trial (1T 69), is an example of the sticker applied by a new car dealer to the window of a car after the dealer has rustproofed the car with a Protector compound. The colors used in the window sticker are red, black, and white. (The parties stipulated that Protector "never uses yellow or blue colors in connection with the display of its trademarks" (PTO Uncontested Fact 24), and our examination of the trial exhibits shows that the Protector marks always use black and red, and sometimes use gray or white.) The window sticker measures 3¾ inches by 1⅞ inches, and contains in the upper left portion the words "THIS VEHICLE SHIELD-ED BY". Under these words appears the "cartouche", on which in larger block white letters appear the words "THE PROTEC-TOR". Connected to the upper right portion of the "cartouche" is a black, white and red helmet, facing left and measuring ¹³⁄₁₆ of an inch by ⁹⁄₁₆ of an inch; the helmet, which does not resemble Ziebart's knight helmet in any respect other than that it is a helmet, is much smaller than the "cartouche" bearing the words "THE PRO-TECTOR". The most striking part of the window sticker are the words "THE PRO-TECTOR", this because of their size and the contrast of white letters on a bright red background.

The evidence indicates that, beginning in 1978 and continuing to the present, Protector has provided rustproofing products for automobiles, operating entirely through distributors of aftermarket products to new car dealers, which distributors sell Protector rustproofing compounds only to new car dealers. Protector—on a smaller scale than Ziebart—has spent substantial sums in promoting the sale of its rustproofing products and the volume of sales resulting has likewise been substantial.

#### 4.

Ziebart at some point learned of the activities of Protector in respect of the sale of automobile rustproofing compounds. By letter dated September 18, 1980, to Protector, broad claims were asserted by Ziebart

in respect of the use by Protector of "window decals" (PX68). We understand that the term "window decals" referred to the "window stickers" above described; these were placed by Ziebart licensed dealers on a window of a car to which the Ziebart licensed dealer had applied Ziebart rustproofing compound; the Protector window stickers were placed by new car dealers on a window of a new car to which the dealer had applied Protector rustproofing compound.

Ziebart in substance asserted exclusive rights in respect of rustproofing products and services to use a "Helmet and Shield Mark" and "the armored knight motif". Ziebart expressed concern that the use of a Protector window sticker and the promotion by it of an "armored knight motif" would bring Protector "so close to Ziebart's trading style and marks that there is a serious likelihood of confusion...." Ziebart threatened that it would bring an action against Protector unless it received satisfactory assurances, etc. Not receiving such assurances, Ziebart commenced this action on January 6, 1981.

#### 5.

The findings of fact made by the district court were substantially as we have stated them above.

The "key question" in determining whether there has been infringement under federal trademark law (the Lanham Act, specifically 15 U.S.C. § 1114(1)) is whether there is likelihood of confusion by the consuming public. *Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 354 (7th Cir.1983; Cummings, C.J.; hereafter cited as *"Henri Food"*). In the case at bar, the key question is whether it is likely that the consuming public (car owners) will be confused into believing that the rustproofing compounds and services of Protector come from the same source as those of Ziebart.

The district court treated the likelihood of confusion issue under "conclusions of law" and concluded that there was no likelihood of any confusion from the marks of Protector and Ziebart. We believe that

whether there is, or is not, likelihood of confusion is a finding of fact to be reviewed under the "clearly erroneous" standard, except that this court can determine just as well as the trial court the factor of similarity of the marks themselves. *Henri Food*, above, at 354. In any event, we agree with Judge Leighton that there is no similarity of the marks themselves which would result in any likelihood of confusion.

■ On an analysis of all the factors, based on our review of the record, we do not believe that the district court clearly erred in finding no likelihood of confusion.

This court, in deciding whether there is likelihood of confusion, has generally considered seven factors (*Henri Food*, above, at 354):

1. the distinctiveness (or strength) of the marks in issue;

2. the similarity of the marks;

3. the similarity of the products;

4. the similarity of the channels of distribution;

5. the identity of the advertising media used;

6. the intent of the claimed infringer; and

7. the evidence of actual confusion.

Of these seven factors, we have referred (*Henri Food*, above, at 355) to three of them—similarity of the marks, intent of the claimed infringer, and evidence of actual confusion—as "the more important".

### 5a.

As indicated above, we have examined the marks of Ziebart and the marks of Protector; we conclude that the marks are not similar. To enable the reader to compare, as did we, the marks here competing, we reproduce below Ziebart's exhibit PX43 as representative of the "knight motif" mark of Ziebart, and Ziebart's exhibit PX16a as representative of the Protector marks claimed to infringe.

PX43

PX16a

These exhibits can be reproduced here only in black and white; in fact, the window stickers on which these marks are used show the marks always in different colors, those of Ziebart in yellow and blue, those of Protector in red, black, gray and white.

Because we have made our own determination as to the factor of similarity and have not relied on the district court's findings, we need not long be detained by the argument for Ziebart that "the trial court may have been applying [to the similarity factor] a theory of copyright law instead of trademark law" (Brief, p. 29).

The name "ZIEBART" always is displayed prominently on or near its marks.

The name "PROTECTOR" is displayed prominently on *all* of Protector's marks.

The parties have stipulated, and we agree, that "[t]he words ZIEBART and THE PROTECTOR are different in sound and meaning". Prominent display of different names on the marks has been held to reduce the likelihood of confusion even where, unlike here, the marks are otherwise similar. *See Pignons S.A. de Mecanique de Precision v. Polaroid Corporation*, 657 F.2d 482, 487 (1st Cir.1981) ("We and other courts have indicated that in certain circumstances otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer."); *see also Ye Old Tavern Cheese Products, Inc. v. Planters Peanuts Division*, 261 F.Supp. 200, 206 (N.D.Ill.1966) (in some circumstances, "where the brand name is prominently stressed in the label, there is not likely to be any confusion as to the source, which is the essence of trademark infringement"), *aff'd mem.*, 394 F.2d 833 (7th Cir.1967) (per curiam). This is especially true here because Ziebart and Protector use different colors in their respective marks: "Protector never uses yellow or blue colors in connection with display of its trademarks" (PTO, Uncontested Fact 24), but rather, as the trial exhibits show, uses red, black, gray and white on its marks; as shown by the trial exhibits, Ziebart uses yellow and blue on its marks. (We have found only one trial exhibit in which Ziebart uses other colors: PX52, a plastic bag given to customers for garbage disposal purposes (4T 198), uses orange, black, and white. The orange in PX52 is much different than the red used by Protector.)

Ziebart argues to this court (Brief, pp. 15–16) that the writing on each of Ziebart's and Protector's window stickers "would not be read at a distance from the rustproofed vehicle nor would one be able to understand the writing on the stickers as they pass by in a moving vehicle nor would one be able to read the writing on the mark when it is on the opposite side of a window of a car in which it is placed after rust-

proofing occurs." This argument evidently is intended to reduce the importance of the prominent display of "Ziebart" and "Protector" on the window stickers of the parties. We are not persuaded by the argument. If the writing cannot be seen in the circumstances enumerated by Ziebart (Brief, pp. 15–16), then no connection would be made between the knight helmet and *either* Ziebart or Protector.

#### 5b.

Another "more important" factor considered in determining likelihood of confusion is the intent of the claimed infringer. The district court treated the intent of Protector as a conclusion of law; we believe this is an issue of fact, if such an issue is raised. For example, "proof of intentional copying" leads readily to a finding of likelihood of confusion (*Henri Food*, above, at 359). But Ziebart presented no evidence whatever of intentional copying or of any other fraudulent intent on the part of Protector. On the contrary, the president of Protector testified without contradiction that the helmet in armor idea was adopted at lunch in a restaurant where the decoration included "knights in armor", from which an idea arose to design "a futuristic Star Wars kind of guy", "a figure to go with our concept" (3T 158). We cannot say that it was "clearly erroneous" for Judge Leighton to find that Protector "presented ample evidence that there was no intent to deceive" on its part.

Counsel for Ziebart argue (Brief, pp. 24–25) that fraudulent intent should be found because the president of Protector knew of Ziebart at the time the Protector marks were first used. The district court did not accept this argument, nor do we. Mere knowledge of a competitor, or even of its mark, does not show fraudulent intent where, as here, the marks used by the claimed infringer Protector are not similar to the marks of the plaintiff Ziebart.

#### 5c.

The third "more important" factor considered in determining whether there is

likelihood of confusion is evidence of actual confusion.

Based on a stipulation of the parties as to "uncontested facts", the district court found that "Ziebart is not aware of any customer that has refrained from dealing with Ziebart or Protector by reason of a specific instance of confusion"; and, until July 30, 1982, the date of the pretrial order: that "Ziebart was not aware of any specific instances of sales by Protector which caused a loss of sales to Ziebart", that "Ziebart was not aware of any person who was confused as to the source of Ziebart's services or products and mistakenly approached Ziebart when they intended to deal with Protector", that "Ziebart was not aware of any instance of actual confusion among its customers by reason of the use by Protector of its trademarks", and that "Ziebart was not aware of any customer who had actually been misled as to the true source of the goods or services sold or offered by Ziebart and products sold by Protector".

In its "conclusions of law", the district court stated in substance that there was no evidence to show any actual confusion between the marks in suit. What the district court stated was this: "Although evidence of actual confusion is entitled to great weight in showing the likelihood of confusion ..., a single misdirected communication provides weak evidence of consumer confusion." We believe that actual confusion is an issue of fact, subject to the "clearly erroneous" standard of review. We are unable to say that it was clearly erroneous to find no evidence of actual confusion. Indeed, the finding seems compelled. We are unable in our review of the record to find the "single misdirected communication" to which the district court refers. In any event, we agree that evidence of a "single misdirected communication" would not show actual confusion of the marks by the consuming public.

The only evidence claimed by Ziebart in this court (Brief, p. 26) to show any actual confusion among consumers is the testimony of Samuel A. Cavallari, a witness for Ziebart (4T 196–252) and a Ziebart "franchise dealer" (4T 197) in Wilmette, Illinois (4T 196). The testimony of Cavallari is said by counsel for Ziebart to be "*circumstantial* evidence" of actual confusion (Brief, p. 25; emphasis supplied). Based on our review of Cavallari's testimony, we agree with the district court that no actual confusion can be said to have been shown by it, whether as "circumstantial evidence" or otherwise.

### 5d.

We agree with the district court's findings on the three "more important" factors in determining likelihood of confusion—that the marks are not similar (this after our own reexamination of the similarity of the marks), that there was no intent by Protector to copy the marks of Ziebart, and that there was no evidence of actual confusion. It is not necessary for us to review the findings of the district court as to the other factors affecting the issue of likelihood of confusion. The findings as to the three "more important" factors establish that there is not sufficient evidence of likelihood of confusion to sustain a claim of infringement by Ziebart under federal trademark and service mark law.

### 6.

Not having shown any likelihood of confusion, Ziebart cannot recover for common law infringement (Count II) (*see James Burrough Limited v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir.1976) ), for common law unfair competition (Count III) (*see Schutt Manufacturing Co. v. Riddell, Inc.*, 673 F.2d 202, 206 (7th Cir.1982) ), for false designation of origin (Count IV) (*see id.*), or, in the absence of any similarity of the marks, for dilution (Count V) (*see Hyatt Corporation v. Hyatt Legal Services*, 736 F.2d 1153, 1158 (7th Cir.), *cert. denied*, 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 361 (1984) ).

The judgment from which this appeal is taken is AFFIRMED.

### ORDER

After the opinion and decision of this Court of September 10, 1986, defendants-

appellees filed on September 11, 1986, a "motion for clarification" of the decision.

The motion points out that a request was made by appellees, in their Brief (pp. 38, 39) to this Court, that we invoke Rule 38 of Federal Rules of Appellate Procedure and award "damages and double costs" to appellees. The motion further points out that the decision of this Court, as reflected in the opinion filed, did not rule on such request.

Fed.R.App.P. 38 would authorize "damages and double costs" were this Court to determine that the appeal of Ziebart was "frivolous." The opinion did not contain any determination that Ziebart's "appeal is frivolous" and, after consideration of the motion, we are unwilling to make such a determination.

Even if the Ziebart appeal were "frivolous," sanctions are not to be imposed automatically but only if in our discretion they are determined to be "appropriate." In making this second determination, this Court looks "for some indication of the appellant's bad faith suggesting the appeal was prosecuted with no reasonable expectation of altering the district court's judgment and for purposes of delay or harassment or out of sheer obstinacy." *Reid v. United States*, 715 F.2d 1148, 1155 (7th Cir.1983). We are unable to find that sanctions would be appropriate here. We note that Ziebart has not been at any time intransigent, has made all reasonable stipulations of fact, has not exhibited bad faith, and has not sought delay.

The motion for clarification is granted but the request for sanctions under Fed.R. App.P. 38 is denied.