**TV LAND, L.P., and TV Land, Inc., Plaintiffs,**

v.

**VIACOM INTERNATIONAL, INC., and Viacom Networks, Inc., Defendants.**

No. 95 C 6273.

United States District Court, N.D. Illinois, Eastern Division.

Nov. 30, 1995.

**546**

Dean A. Dickie, Michael John Lyle, Steven L. Baron, Joseph L. Stone, D'Ancona & Pflaum, Chicago, IL, for plaintiffs.

Robert M. Newbury, Pattishall, McAuliffe, Newbury, Hillard & Geraldson, Chicago, IL, Stephen F. Huff, Fryor, Cashman, Sherman & Flynn, New York City, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRIAN BARNETT DUFF, District Judge.

On October 30, 1995, TV Land, L.P., and TV Land, Inc. ("Plaintiffs"), sued Viacom International, Inc., and Viacom Networks, Inc. ("Defendants"), alleging (1) infringement of a federally registered servicemark; (2) false designation of origin under Section 43(a) of the Lanham Act; (3) common law trademark infringement; (4) dilution of mark and injury to business reputation, (5) unfair competition; (6) violation of the Illinois Uniform Deceptive Trade Practices Act; and (7) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. On November 9, the Plaintiffs moved for a temporary restraining order. Subsequently, they moved for a preliminary injunction. On November 16, 17 and 20, we conducted a preliminary injunction hearing. On November 21, the parties submitted their proposed Findings of Fact and Conclusions of Law ("FF & CL"). Below, we present our findings and conclusions, and we grant the Plaintiffs' motion for a preliminary injunction.

### FINDINGS OF FACT

#### I.   The Parties

TV Land, L.P., is an Illinois limited partnership organized and existing under the laws of the State of Illinois with its principal office in Chicago, Illinois. TV Land, Inc., is the limited partnership's general partner, and it is an Illinois corporation with its principal place of business in Chicago, Illinois. Compl. at ¶ 1.

The Plaintiffs operate three retail stores called TV Land. In November 1991, they opened the first store, and in November 1992, they opened the second and third stores. Compl. at ¶ 5. The stores are in shopping malls in suburban Chicago. Over fifteen million people each year visit those malls. Tr. at 109–10.

The stores sell gifts and apparel relating to television networks, programs and characters. Compl. at ¶ 5. The merchandise includes t-shirts, hats, books, calendars, coffee mugs, keychains, stuffed animals, neckties, watches, clocks, posters, sweatshirts, jackets, sweatpants, pencils, pens, bumper stickers, greeting cards, gym bags and other apparel, gifts and novelty items. Compl. at ¶ 8. The merchandise relates primarily (80%–90%) to current networks, programs and characters. It relates secondarily (10%–20%) to classic, non-current networks, programs and characters.

Viacom International, Inc., is a corporation organized and existing under the laws of the

State of Delaware. Compl. at ¶ 2. It owns Viacom Networks, Inc., which is a New York corporation with its principal place of business in New York, New York. Viacom Networks is a pay cable television company. Compl. at ¶ 3.

Viacom Networks has a programming service called Nickelodeon, which airs 24 hours each day and, during the day, caters mainly to children. Tr. at 246 and 276. Since 1985, Nickelodeon has had a programming segment called Nick at Nite, which airs approximately 10 hours each night and caters mainly to adults. Tr. at 246–48 and 278. Nick at Nite features exclusively classic, non-current television shows. Nickelodeon/Nick at Nite is available in more than 50 million households nationwide, including households in the Chicago metropolitan area. Compl. at ¶ 14.

## II. The Plaintiffs' Use of "TV Land"

On October 4, 1991, the Plaintiffs filed for federal registration of the mark "TV land." In November 1991, they first used the mark. On June 8, 1993, the U.S. Patent and Trademark Office issued Certificate of Registration Number 1,776,083 for the mark for a "retail store selling merchandise related to television networks, programs, and characters." Pls.' Ex. 1.

Since 1991, the Plaintiffs have used their mark continuously in association with their retail stores. They display the mark in bold, large letters on the stores' exteriors and interiors. Compl. at ¶ 10; Pls.' Ex. 4.

Since 1991, the Plaintiffs have used their mark continuously in association with their merchandise. They sell and distribute t-shirts and distribute hats bearing the mark. Moreover, they use bags, buttons, tags, stickers and gift boxes bearing the mark. Compl. at ¶ 10; Pls.' Exs. 6–10 and 14–17; Tr. at 128, 132–35 and 137–38.

Since 1991, their mark's reputation has grown throughout the consumer and vending markets in Illinois and other states. The stores have received press coverage in national, regional and local newspapers and on Superstation WGN television. Compl. at ¶ 10; Pls.' Ex. 2; Tr. at 144–47.

Around May 1995, the Plaintiffs obtained the telephone number 1–800–66–TV–LAND to enable customers throughout the country to place toll-free orders for their products. Tr. at 141–42. They included this 800 number in an advertisement in the June 10–16, 1995, issue of TV Guide for Cleveland, Ohio. Pls.' Ex. 13.

The Plaintiffs have plans to expand the TV Land business to a national chain of retail stores. Mr. Joshua Lowitz, president of TV Land, contacted an investment banker to formulate a proposal for expansion, and Mr. Lowitz regularly considers leasing opportunities for bringing TV Land to malls throughout the country. Compl. at ¶ 10; Tr. at 115 and 118.

## III. The Defendants' Use of "TV Land"

In 1988, the Defendants hired an advertising agency to design a campaign that would create viewer loyalty to Nick at Nite. The agency designed a campaign that used the concept of "TV Land," a fictitious Nick at Nite environment in which Donna Reed lives down the street from Mr. Ed, and Car 54 patrols the neighborhood. Tr. at 249–50, 280–81, and 283.

Beginning in 1988, the Defendants used the phrases "Hello out there from TV land" and/or "TV Land" in on-air promotions, billboards, trade advertising, live events, direct mail campaigns to the public, off-channel consumer advertising, and on merchandise. Defs.' Exs. 4, 8, and 11–17; Tr. at 325 and 263.

Between 1988 and 1992 and in 1995, the Defendants spent over $4.5 million to produce over 100 promotional spots that refer to "Nick at Nite" and to "TV Land," although not to "Nick at Nite TV Land." Since 1988, they have aired those spots. Defs.' Ex. 1a; Tr. at 269, 284, 325–6, and 394–5.

Since 1989, the Defendants have often placed an "SM" or "TM" symbol following their use of the phrase "Hello out there from TV land." Defs.' Exs. 3, 8, and 10–17; Tr. at 300, 302, 304–05, and 310–14.

Since 1989, the Defendants have erected in various cities murals and billboards depicting the mark Nick at Nite and the phrase "TV

Land." They erected two in Chicago. In 1989, they erected a mural at the corner of LaSalle and Grand. It remained until 1992. In 1992, they erected a billboard at the corner of Franklin and Ontario. It remains until today. Defs.' Exs. 6 and 7; Tr. at 262, 284–85 and 298–99.

In 1989 and 1990, the Defendants sponsored national Nick at Nite TV Land Tours. The Tours visited numerous cities, including Chicago, with interactive, nostalgic television exhibits, performances, and celebrity guest appearances. Defs.' Exs. 1–4; Tr. at 284, 287–88, and 292. The Tours cost approximately $800,000. Defs.' Ex. 4; Tr. at 263, 290–91, 294, and 297. They received wide media attention. Defs.' Ex. 4; Tr. at 269, and 289–90.

During the Tours, the Defendants sold t-shirts with the logo "Nick at Nite TV Land Tour." After the Tours and prior to 1995, they sold a few items containing the phrase "Hello out there from TV land." Defs.' Exs. 9–30; Tr. at 294–95, 309–314 and 335–36.

In 1995, the Defendants decided to spin off a stand-alone, 7–day–a–week, 24–hour–a–day programming network called "Nick at Nite TV Land." Tr. at 315–16 and 329. They further decided that the new network would feature exclusively classic, non-current television shows. Tr. at 317, 338, 340–42 and 391.

Although the Defendants claim that they intend officially to call the new network "Nick at Nite TV Land," press reports indicate that they and others will primarily call it "TV Land." Compl. at Ex. E; Pls.' Ex. 20; Defs.' Ex. 31; Tr. at 278, 290–91, 294, 297, 336 and 338. The Defendants did not request that the press retract those reports. Tr. at 349–50.

In anticipation of the new network, the Defendants use the phrase "Nick at Nite TV Land" in on-air promotions and on a variety of merchandise. Defs.' Exs. 1, 1a and 18–30; Tr. at 269 and 335–36. They intend to continue using the phrase in connection with the new network and the sale of merchandise. Defs.' Ex. 18–30; Tr. at 315–19, 324–25 and 340–42.

On September 15, 1995, the Defendants filed fourteen applications for intent to use the mark "TV LAND" and one application predicated upon use of the mark "TV LAND" in connection with a variety of goods and services. Pls.' Ex. 26; Aff. of Richard Cronin at Ex. F. They filed no federal trademark application for the mark "Nick at Nite TV Land". Pls.' Ex. 3.

Among the goods and services for which the Defendants seek trademark protection, the Plaintiffs sell the following: keychains, watches, time pieces, printed matter, books, calendars, posters, decals, bumper stickers, note cards, bags, knapsacks, fanny packs, tote bags, briefcases, furniture, namely director's chairs, non-metal keychains, mugs, tumblers, containers for food or beverage (thermal insulated), clothing, headgear, games and play things and toy dolls. Compl. at ¶ 16.

Among the goods and services for which the Defendants seek trademark protection, the Plaintiffs may eventually sell the following: audio and visual sound recordings, earrings, bracelets, dog tags, necklaces, identification bracelets, paper, newspapers, magazines, playing cards, trading cards, portfolios, pillows, towels, handkerchiefs, sew-on patches for clothing, amusement articles, video games and board games, computerized amusement apparatus, decorations for Christmas trees, computer products, namely game cartridges for computer video games and video output game machines and instructional material sold as a unit, computer game cassettes, computer game tapes and manuals sold as a unit, CD ROM games, and audio output games. *Id.*

The Defendants intend to sell the merchandise from stores that they do not own such as Nordstroms and Target. Tr. at 355.

The Defendants also intend to sell the merchandise from stores that they do own. In 1995, they opened a retail kiosk at an Orlando, Florida amusement facility, which kiosk sells a variety of goods, including hats and shirts, prominently displaying the phrase "TV Land." Defs.' Ex. 27. The Defendants intend to open a retail store on Michigan Avenue in Chicago, Illinois. Compl. at ¶ 20. They do not, however, intend to open a retail

store called "Nick at Nite TV Land." Tr. at 325.

Since the summer, the Defendants have spent over $1.2 million in advertising and promotion for their new network. Tr. at 327. They will have to spend between $60 million and $120 million to launch it. Tr. at 337.

On February 29, 1996, the Defendants intend to launch the new network. Tr. 317, 338, 340–42 and 391.

### IV. The Defendants' Knowledge of the Plaintiffs' Use of "TV Land"

In February 1992, Mr. Larry Jones, who identified himself to Mr. Lowitz as Nick at Nite's Director of Marketing, visited one of the Plaintiffs' TV Land stores and purchased a substantial amount of merchandise. Tr. at 159.

In June 1995, the Defendants conducted a trademark search and learned that the Plaintiffs have a federally registered servicemark for "TV Land." Tr. at 329.

In September 1995, Mr. Cronin, the senior vice president of Nick at Nite, told Mr. Lowitz that Nick at Nite's plan to use the name "TV Land" might create confusion in the marketplace. Compl. at ¶ 17; Tr. at 163 and 331. The Plaintiffs, however, know of no actual confusion resulting from the Defendants' actions related to this case. Tr. at 226 and 234.

### V. Expert Testimony on the Likelihood of Consumer Confusion

Dr. Bobby Calder, the Charles H. Kellstadt Distinguished Professor of Marketing and the Director of the Center for Cultural Marketing at Northwestern University's Kellogg Graduate School of Management, testified as an expert for the Plaintiffs on the marketing and psychological aspects of consumer associations and consumer confusion. Pls.' Ex. 24.

Dr. Calder testified that if the Defendants use "TV Land" as a brand name on retail products and in connection with their new network, there will be confusion among consumers. Tr. at 57.

Dr. Calder testified that if they use "TV Land" as a brand name, consumers will associate the name with classic, non-current television shows, not with a chain of retail stores selling gifts and apparel relating to all manner of television networks, programs and characters. Tr. at 61–62.

Dr. Calder testified that if they use "TV Land" as a brand name, consumers may come to the stores looking for classic, non-current items and be disappointed with the stores' selection, or they may not come to the stores at all. Tr. at 58–59 and 63.

Dr. Calder testified that consumers may be confused whether the Defendants call the network "TV Land" or "Nick at Nite TV Land" and they may be confused whether the Defendants open a retail store called "TV Land" or sell through other outlets. Tr. at 70–71.

Dr. Yoram Wind testified as an expert for the Defendants, but they exclude his testimony from their proposed FF & CL. That is just as well; we did not find his testimony persuasive. *See* Tr. at 80 and forward.

### ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. Analytical Overview

■ "A preliminary injunction is warranted if the movant can make a threshold showing (1) that the case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; [and] (3) that the movant will suffer irreparable harm if the injunction is not granted." *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir.1994). "If these three conditions are met, then the court must balance the harm to the movant if the injunction is not issued against the harm to the defendant if it is issued improvidently." *Id.* "In addition, the court must consider the public interest in whether the injunction is to be granted or denied." *Id.* The consideration of these factors "involves a 'sliding scale' analysis: the greater the movant's chance of success on the merits, the less strong a showing must it make that the balance of harms is in its favor." *Id.*

## II. Discussion

### A. Likelihood of Success on the Merits

#### 1. Infringement of a Federally Registered Servicemark

■ To prove trademark infringement under 15 U.S.C. § 1114(1)(a), a plaintiff must show that: (a) the defendant used the plaintiff's registered trademark without consent; (b) the use was in connection with the sale of goods or services; and (c) such use was likely to cause confusion or to deceive purchasers as to the source or origin of the goods or services.

##### a. Use of the Plaintiffs' Mark without Consent

The Defendants used the Plaintiffs' mark, *see* Section II.A.1.c. 1), without the Plaintiffs' consent. Moreover, it is undisputed that they intend to continue using the mark without consent.

##### b. Use in Connection with the Sale of Goods and Services

The Defendants used the Plaintiffs' mark, *see* Section II.A.1.c. 1), in connection with the sale of goods and services. Moreover, it is undisputed that they intend to continue using the mark in connection with such sales.

##### c. Use Likely to Cause Confusion

■ "The 'keystone' of trademark infringement is 'likelihood of confusion' as to source, affiliation, connection or sponsorship of goods or services among the relevant class of customers and potential customers." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir.1992), *cert. denied*, 507 U.S. 1042, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993). "In this case, [the Plaintiffs] rel[y] ... on the doctrine of 'reverse confusion.'" *Id.* "Reverse confusion occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user." *Id.* "In such a case, ... the senior user is injured because"

> [t]he public comes to assume that the senior user's products are really the junior user's or that the former has become somehow connected with the latter. The

result is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

*Id.* (quoting *Ameritech, Inc. v. Am. Info. Technologies Corp.*, 811 F.2d 960, 964 (6th Cir.1987)). "[R]everse confusion is a redressable injury under the Lanham Act." *Id.* at 958.

■ "This circuit considers the following seven factors ... to be important in evaluating the likelihood of confusion in trademark infringement cases: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the complainant's mark; (6) actual confusion; and (7) intent of defendant to palm-off his product as that of another." *Smith Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1329 (7th Cir.1993) (internal quotation omitted). " 'None of these factors by itself is dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved.' " *McGraw–Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1168 (7th Cir.1986) (quoting *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 218 (5th Cir.1985)). However, it may be reversible error to "place excessive importance on certain factors." *Id.; cf. Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360 (7th Cir.1995).

##### 1) Similarity Between the Marks

■ The Defendants propose a mark "TV Land" that will be identical to the Plaintiffs' mark in sound and virtually identical in appearance. The marks differ in appearance in that the Plaintiffs' "Land" is in lower-case script letters, but the Defendants' proposed "Land" is in upper-case block letters. Moreover, the Plaintiffs' mark is on one line of text, but the Defendants' proposed mark is on two lines, with the "TV" on the top and the "Land" on the bottom. These differences are insignificant.

The Defendants also propose to place their house mark "Nick .at Nite" before "TV Land." "Prominent display of different [house] names on the marks has been held to reduce the likelihood of confusion even where ... the marks are otherwise similar." *Ziebart Int'l Corp. v. After Market Assocs., Inc.,* 802 F.2d 220, 227 (7th Cir.1986); *see McGraw–Edison,* 787 F.2d at 1168–9. In this case, however, newspapers report that the Defendants will not consistently and prominently display their house mark before "TV Land." *See* Compl. at Ex. E; Pls.' Ex. 20. In any event, if the newspapers are incorrect, "[u]nder the circumstances [of a reverse confusion case], the linking of the plaintiff's mark with the defendant's brand name is an aggravation, not a justification." *Sands,* 978 F.2d at 960.

Therefore, we conclude that the similarity between the marks factor favors the Plaintiffs.

### 2) Similarity of the Products

"[I]n determining the likelihood of confusion between products[,] [t]he question is 'whether the products are the kind the public attributes to a single source.'" *McGraw–Edison,* 787 F.2d at 1169. "The fact that the products at issue may be 'very different' is not dispositive of the issue of the similarity of the products." *Id.* (quoting *E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports, Inc.,* 756 F.2d 1525, 1530, *reh'g denied,* 765 F.2d 154 (11th Cir.1985)). "'[T]he rights of an owner of a registered trademark ... extend to any goods related in the minds of consumers in the sense that a single producer is likely to put out both goods.'" *Id.* (quoting *Remy Martin,* 756 F.2d at 1530). "Protecting the trademark owner's interest in capitalizing on the good will associated with its mark ... is especially compelling in the context of a reverse confusion case." *Sands,* 978 F.2d at 958.

First, we consider the Defendants' proposed retailing products. The Defendants filed intent-to-use trademark applications for a host of goods and services that would compete directly with the goods and services that the Plaintiffs offer. In fact, their intent-to-use applications suggest that they will use the mark "TV Land" on twenty-five types of products that Plaintiffs currently sell and on another .twenty-five products that Plaintiffs may sell in the future. The Defendants intend to compete with the same products in the same market.

Second, we consider the Defendants' proposed networking product. The products at issue, the Defendants' networking and the Plaintiffs' retailing, are very different, but that is not dispositive. For example, Warner Brothers offers entertainment services and retail outlets; the Walt Disney Company has the Disney Stores and the Disney Channel; The Discovery Channel has the Discovery Channel Stores; and WTTW Television is a partner in the WTTW Store of Knowledge. At this point, consumers likely believe that, where a network and retail outlet have the same name, a single producer puts out both goods.

Therefore, we conclude that the similarity of the products factor favors the Plaintiffs.

### 3) Area and Manner of Concurrent Use

"The 'area and manner of concurrent use' factor requires us to consider whether there is a relationship in use, promotion, distribution, or sales between the goods and services of the parties." *Forum Corp. v. Forum Ltd.,* 903 F.2d 434, 442 (7th Cir.1990). "The parties need not be in direct competition" and their "lines of business need not be the same, so long as their 'products [or services] are the kind the public attributes to a single source.'" *Id.* (quoting *Int'l Kennel Club of Chicago v. Mighty Star, Inc.,* 846 F.2d 1079, 1089 (7th Cir.1988)). (quoting another case). "'[A] trade-mark protects the owner against not only its use upon the articles to which he has applied it but also upon such other articles as might naturally or reasonably be supposed to come from him.'" *Id.* (quoting *Helene Curtis Indus. v. Church & Dwight Co.,* 560 F.2d 1325, 1331 (7th Cir.1977), *cert. denied,* 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978)) (quoting another case).

First, we consider the Defendants' proposed retailing products. They and the Plaintiffs would target the same class of per-

552

sons, television-watching retail consumers, for the same class of merchandise, products related to television programs. If the Defendants use the mark "TV Land" for retailing, there would likely be a relationship in the use, promotion, distribution, and sales between their and the Plaintiffs' operations.

Second, we consider the Defendants' proposed networking product. They and the Plaintiffs would target the same class of persons, television watchers, for a different class of merchandise, television programs instead of products related to television programs. As we discussed above, however, if the Defendants use the mark "TV Land" for networking, in the minds of consumers there would likely be a relationship in the promotion and sales between their and the Plaintiffs' operations.

Therefore, we conclude that the area and manner of concurrent use factor favors the Plaintiffs.

*4) Degree of Care Exercised By Consumers*

"[P]resumably consumers take less time purchasing low cost items, and haste increases the possibility of confusion." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611 (7th Cir.1993). "[W]here the product involved is a low value item, the risk of confusion is greater 'because purchasers are unlikely to complain when dissatisfied, which would bring to light confusion; but rather they are likely to avoid all products produced by the company which they believed produced the product that caused the trouble.'" *Id.* at 616–7 (quoting *Maxim's Ltd. v. Badonsky*, 772 F.2d 388, 393 (7th Cir.1985)) (quoting another case).

■ In this case, the Plaintiffs' stores cater to a wide range of retail consumers who shop for gifts and apparel relating to television networks, programs and characters. The Plaintiffs' merchandise is generally of low cost, and consumers purchasing the merchandise often do so on impulse. Moreover, although the consumers may be knowledgeable about television shows, there is little or no evidence that they are knowledgeable or sophisticated about the sources of their television-related products.

Therefore, we conclude that the degree of care factor favors the Plaintiffs.

*5) Strength of the Plaintiffs' Mark*

■ "'The term "strength" as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular ... source.'" *Sands*, 978 F.2d at 959 (quoting *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2nd Cir.1979)). "Trademarks may be placed into four categories according to strength and the corresponding amount of protection which will be accorded them." *McGraw-Edison*, 787 F.2d at 1170 (internal quotation omitted). In ascending order of strength, those categories are (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 991 (7th Cir.1989). A mark's strength "'is of little importance where the conflicting mark is identical and the goods are closely related.'" *Sands*, 978 F.2d at 959 (quoting 1 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 11:24, at 505–6 (1991 Supp.)). Also, "[i]n a reverse confusion case, ... it may make more sense to consider the strength of the mark in terms of its association with the junior user's goods." *Sands*, 978 F.2d at 959.

■ We consider the Plaintiffs' mark's strength. First, the Plaintiffs have a federally registered trademark, and they are entitled to a presumption that their mark is valid. 15 U.S.C. § 1115(a). In any event, their mark has acquired strength through extensive public exposure and continuous use over the last four years. It has appeared prominently at the front of all TV Land stores and throughout their interiors. It has appeared on t-shirts and hats, and on all promotional material such as bags, buttons and stickers. It has appeared on all price tags and shopping bags. And it has appeared on all gift boxes. Second, their mark is suggestive; it identifies their stores as places that sell gifts and apparel related to television networks, programs and characters. If it were descriptive, it would identify their stores as places that sell televisions or television-related equipment. *See Computer-*

*land Corp. v. Microland Computer Corp.,* 586 F.Supp. 22, 25 (N.D.Cal.1984). Their mark is strong. Third, however, whether their mark is strong is unimportant because the Defendants' proposed conflicting mark is virtually identical and their goods are closely related. *See Sands,* 978 F.2d at 959; *see also* Sections II.A.1.c. 1) and 2).

Because this is a reverse confusion case, we also consider the strength of the mark in terms of its association with the Defendants' goods. *See Id.* According to the Defendants, since 1989, the phrase "TV Land" has had a strong association with their goods. Defs.' Proposed FF & CL at ¶¶ 21–23. The Defendants' recent branding efforts have likely strengthened the association. Moreover, if the Defendants launch their retailing and networking operations, they will strengthen the association further. We note that any pre–1995 association cannot sustain the Defendants' "prior use" argument because they never used the phrase "TV Land" in a manner that would bestow trademark rights. They used it only as a generic or traditional reference to the fictitious world presented in television shows.

Therefore, we conclude that the strength of the mark factor favors the Plaintiffs.

### 6) Actual Confusion

■ Proof of actual confusion is unnecessary to establish infringement. *Libman,* 69 F.3d at 1362–1363; *AHP,* 1 F.3d at 618. The Plaintiffs admit, however, that they know of no actual confusion in the marketplace resulting from the Defendants' actions related to this case. Therefore, we conclude that the actual confusion factor favors the Defendants.

### 7) Intent of the Defendants

■ "In a reverse confusion case, ... the defendant by definition is *not* palming off or otherwise attempting to create confusion as to the source of his product." *Sands,* 978 F.2d at 961. Therefore, in a reverse confusion case, "the 'intent' factor ... is essentially irrelevant." *Id.* And therefore, we do not analyze this factor.

Therefore, considering the above factors, we conclude that the Plaintiffs demonstrate a likelihood of success on the merits of their federal trademark infringement claim.

### 2. Other Causes of Action

The Plaintiffs also allege causes of action for false designation of origin under Section 43(a) of the Lanham Act, common law trademark infringement, dilution of mark and injury to business reputation, common law unfair competition, violation of the Illinois Uniform Deceptive Trade Practices Act, and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

■ To determine whether the Plaintiffs demonstrate a likelihood of success on the merits of their Section 43(a) of the Lanham Act claim, we must consider whether they have a protectable trademark and whether the Defendants' use of that mark will likely cause confusion among consumers. *Munters Corp. v. Matsui Am., Inc.,* 909 F.2d 250, 252 (7th Cir.), *cert. denied,* 498 U.S. 1016, 111 S.Ct. 591, 112 L.Ed.2d 595 (1990). For their state law claims, except for dilution, we must also consider the same likelihood of confusion among consumers. *AHP,* 1 F.3d at 619; *McGraw–Edison,* 787 F.2d at 1174. We considered these issues in connection with the Plaintiffs' trademark infringement claim, and we do not repeat them here. Instead, we conclude that, for the reasons stated above, the Plaintiffs also demonstrate a likelihood of success on the merits of these claims.

■ Under the Anti–Dilution statute, "an injunction *must* be granted if the prior user can show that the mark is distinctive and that the subsequent user's use dilutes that distinctiveness." *Ringling Bros.–Barnum & Bailey Combined Shows, Inc. v. Celozzi–Ettelson Chevrolet, Inc.,* 855 F.2d 480, 482 (7th Cir.1988) (quoting *Hyatt Corp. v. Hyatt Legal Servs.,* 736 F.2d 1153, 1157 (7th Cir), *cert. denied,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 361 (1984)). To determine whether the mark is distinctive, we consider "the type of mark, ... the length of time the mark has been used, the scope of advertising and promotions, the nature and extent of the business, and the scope of the first user's reputation." *McGraw–Edison,* 787 F.2d at 1174.

■ We consider whether the Plaintiffs' mark is distinctive. The Plaintiffs' mark is not coined. They have used the mark continuously for four years. They have advertised sparingly, mainly through the malls in which their stores are located, although they have received some spontaneous promotions from the media. Their business amounts to three retail outlets, plus a 1–800 number. The scope of their reputation spans a percentage of the fifteen million people each year who visit the malls in which their stores are located, and it spans an uncertain number of people who are familiar with the stores through the media or otherwise through second-hand means. At this stage, we find that the Plaintiffs' mark is not sufficiently distinctive. Because it is not, we do not now need to consider whether the Defendants' use of the mark dilutes its distinctiveness. We conclude that the Plaintiffs have little chance of success on the merits of this claim.

### B. Adequacy of a Legal Remedy and Irreparable Harm

■ "The damages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law." *Processed Plastic Co. v. Warner Communications, Inc.,* 675 F.2d 852, 858 (7th Cir.1982); *C.B. Fleet Co., Inc. v. Complete Packaging Corp.,* 739 F.Supp. 393, 398 (N.D.Ill.1990). Moreover, "there is no effective way to measure the loss of sales or potential growth—to ascertain the people who don't knock on the door or identify the specific persons who do not reorder because of the existence of the infringer." *Instrumentalist Co. v. Marine Corps League,* 509 F.Supp. 323, 333 (N.D.Ill.1981), *aff'd,* 694 F.2d 145 (7th Cir.1982).

The Plaintiffs' concept of "TV Land" encompasses products related to all manner of television shows, but primarily current shows. As Dr. Calder testified, if the Defendants use their proposed mark, they would quickly and forcefully narrow the concept of "TV Land" to one that encompasses products related only to classic, non-current shows. In the wake of this narrowing, an uncertain number of potential customers would enter the Plaintiffs' stores and become disappointed with the selection, and an uncertain number would not enter them at all. More generally, if the Defendants use their proposed mark, the Plaintiffs would lose control of their reputation and good will. Therefore, we conclude that, if the Defendants use it, the Plaintiffs would have an inadequate legal remedy and would suffer irreparable harm.

### C. Balance of the Harms

If we do not enjoin the Defendants, the Plaintiffs would lose control of their reputation and good will. *See Int'l Kennel,* 846 F.2d at 1091–92. They would risk losing four years worth of nurturing their business. And they would risk losing their entire investment. On the other hand, if we enjoin the Defendants, the Defendants would suffer a loss of reputation because, at this late stage, they would have to change the name of their proposed network. They testified that they could change the name, but that it would be difficult. The Defendants would lose months worth of nurturing their proposed network under the name "TV Land," one of five final name choices. And the Defendants would lose advertising and promotion expenditures of $1.2 million, a small portion of the cost of launching their new network. We consider that the Defendants knew of the Plaintiffs' stores as early as February 1992, and they knew of the Plaintiffs' mark as early as June 1995, so they knowingly risked many of the harms they now face. On balance, we find that the Plaintiffs face greater harms.

### D. The Public Interest

The public interest is served by protecting trademarks. *See, e.g., Int'l Kennel,* 846 F.2d at 1092, n. 8. In this case, because we find that the Plaintiffs have a likelihood of success on the merits, we find that we will best serve the public interest by protecting their trademark and enjoining the Defendants.

### CONCLUSION

Therefore, for the reasons discussed above, we grant the Plaintiffs' motion for a preliminary injunction. Accordingly, we enjoin the Defendants, their officers, agents, servants, employees, and all others in active concert or

participation with them, from using the phrase "TV Land," or any similar phrase, as a mark or brand in their networking or retailing operations.